IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INORMATION ASSOCIATED WITH PARTICULAR CELLULAR TOWERS | Case No. __25-mj-7-01-AJ__<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**APPLICATIONS FOR SEARCH WARRANT**

I, Timothy S. Hoover, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, being duly sworn, hereby depose and state under oath as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a warrant for records and information associated with certain cellular towers ("cell towers") that is in the possession, custody, and/or control of:

 a.  AT&T Corporation ("AT&T"), a cellular service provider headquartered at 11760 U.S. Highway 1, Suite 300, North Palm Beach, Florida;

 b.  T-Mobile US, Inc. ("T-Mobile"), a cellular service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey;

 c.  Cellco Partnership d/b/a Verizon Wireless ("Verizon"), a cellular service provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey; and

 d.  United States Cellular Corporation ("U.S. Cellular"), a cellular service provider headquartered at 8410 W Bryn Mawr Ave, Suite 700, Chicago, Illinois; (collectively, the "WIRELESS PROVIDERS").

2.      The information to be searched is described in the following paragraphs and in Attachments A-1, A-2, A-3, A-4, A-5, and A-6.  This affidavit is made in support of applications

1

for search warrants under 18 U.S.C. § 2703(c)(1)(A) to require the WIRELESS PROVIDERS to disclose to the government the information described in Section I of Attachments B-1, B-2, B-3, B-4, B-5 & B-6.  Upon receipt of the information described in Section I of Attachments B-1, B-2, B-3, B-4, B-5 and B-6, government-authorized persons will review the information to locate items described in Section II of Attachments B-1, B-2, B-3, B-4, B-5, and B-6.

3.      I am a Special Agent employed by the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").  As such, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. §2510(7); that is, an officer empowered by law to conduct investigations of, and make arrests for, offenses enumerated in18 U.S.C. §2516.  I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws.  I have been employed by ATF since 2001 as a Special Agent.  I have a completed the Criminal Investigator Training Program and the ATF Special Agent Basic Training program, both of which are conducted at the Federal Law Enforcement Training Center in Glynn County, Georgia.  I have received specialized training in firearms identification and the investigation of firearms-related offenses.  I have participated in investigations involving the unlawful possession of firearms by prohibited persons, including persons who are previously convicted felons; the possession of firearms in furtherance of the distribution of narcotics; and the use of firearms in the commission of violent acts.  I have participated in investigations involving individuals who unlawfully possess firearms, of individuals illegally selling firearms, and of individuals distributing illegal drugs.  As such, I have coordinated the controlled purchases of illegal firearms and narcotics utilizing confidential sources, cooperating witnesses and undercover law enforcement officers; written, obtained and coordinated the execution of search and arrest warrants pertaining to individuals involved in the

illegal possession and distribution of firearms and narcotics; conducted electronic and physical

surveillance of individuals involved in illegal drug distribution; analyzed records documenting

the purchase and sale of firearms and illegal drugs; provided testimony, both in Grand Jury

proceedings and District Court proceedings; and spoke with informants and subjects, as well as

local, state and federal law enforcement officers, regarding the manner in which individuals

obtain, finance, store, manufacture, transport, and distribute their illegal firearms and drugs.  In

addition, I have been involved in the investigation of street gangs, including gangs with a

national presence as well as locally based gangs.  I have received training, both formal and on-

the-job, in the provisions of the federal firearms and narcotics laws administered under Titles 18,

21 and 26 of the United States Code.

4.      Throughout my career, I have used cellular records and information, including

location information, to further those investigations, including utilizing information from "tower

dumps" to identify and locate subjects involved in criminal activity.

5.      I am familiar with the facts and circumstances of this investigation from my own

personal observations, my training and experience, my own participation in the investigation as

well as information obtained from other members of law enforcement.  Since this affidavit is

being submitted for the limited purpose of establishing that probable cause exists to support the

issuance of a search warrant, I have not included details about every aspect of the investigation.

While this affidavit contains all the material information, I am aware of that is pertinent to the

requested search warrants, it does not set forth all my knowledge about this matter.

6.      Based on the facts set forth in this affidavit, I have probable cause to believe that

violations of 18 U.S.C. §922(j), unlawful possession of a stolen firearm, and 18 U.S.C. §922(u)

theft from a Federal Firearms Licensee ("FFL"), and 18 U.S.C. § 371: conspiracy to commit the

offenses of 18 U.S.C. §922(j) and 18 U.S.C. §922(u) (collectively, the "TARGET OFFENSES"), have been, are being, and will continue to be committed by three unidentified suspects (collectively, the "SUSPECTS").  As further described below, there is also probable cause to believe that searching the information described in Attachments A-1, A-2, A-3, A-4, A-5, and A-6 will reveal evidence of the TARGET OFFENSES as further described in Attachments B-1, B-2, B-3, B-4, B-5, and B-6.

## PROBABLE CAUSE

7.       On Wednesday, November 27, 2024, at approximately 10:25 p.m., a burglary occurred at Northeast Munitions, an FFL located at 416 Daniel Webster Highway, Suite F, Merrimack, New Hampshire 03056.  Northeast Munitions is a located in a strip mall with a parking lot in front, located immediately off Daniel Webster Highway, a major highway that runs south from Manchester, through Merrimack, until joining Everett Turnpike just north of Nashua. There are multiple other businesses also within the strip mall, including the DW Diner, which is adjacent to Northeast Munitions and faces the Daniel Webster Highway, and the Children's Den, which is a childcare center in the rear of the strip mall facing the Souhegan River.

8.       No alarms were triggered during the burglary.  The following morning, on Thursday, November 28, 2024, at approximately 9:40 a.m., a worker who was there to salt the parking lot noticed that the door to the business had been smashed and reported the break-in to Merrimack Police Department ("MPD").  MPD notified the ATF, and the ATF Manchester Field Office assisted in the investigation.

9.       Responding officers observed that entry had been made to the business by breaking the glass on the front door.  A glass display case inside the store containing firearms was also smashed.  A total of seven (7) pistols, one (1) shotgun and an undetermined number of

ammunition boxes were stolen during the burglary.  ATF worked with the FFL to conduct an inventory of their firearms, and the following eight firearms were determined to be stolen during the break-in:

| MANUFACTURER | MODEL | CALIBER | TYPE | SERIAL NUMBER |
|---|---|---|---|---|
| Glock GMBH | 17GEN4 | 9mm | Pistol | BGMV904 |
| Glock GMBH | 17 | 9mm | Pistol | ADKF510 |
| Glock GMBH | 45 | 9mm | Pistol | BWDK860 |
| Sun City Machinery Co., LTD | Stevens 320 | 12 gauge | Shotgun | 240560H |
| Bul Transmark LTD | SAS II | 9mm | Pistol | BAU-F042 |
| Heckler and Koch | VP9 | 9mm | Pistol | 224-201587 |
| Springfield Armory | Prodigy | 9mm | Pistol | NMH31750 |
| Smith & Wesson | M&P 9 | 9mm | Pistol | DLK9864 |

10.      Due to the Thanksgiving holiday on Thursday, November 28, 2024, the surrounding businesses were closed, and there was no ability to begin requesting surveillance footage from those nearby businesses.  ATF resumed their investigation the following day, on Friday, November 29, 2024.  Along with the assistance of MPD detectives, investigators began canvassing the immediate area around Northeast Munitions to request video footage. Investigators have obtained a number of surveillance footage from the evening around the time of the burglary on Wednesday, November 27, 2024, and reviewed that surveillance.  I have personally reviewed these videos, and I summarize my observations of what can be collectively observed on video surveillance as follows:

11.      It appears that SUSPECTS arrived in a black sedan, that has turn indicators on the sideview mirrors, thin, roughly rectangular rear brake lights, a third brake light that sits at the top of the rear window, and a rear license plate that sits low on the bumper, well below the rear taillights ("SUSPECT VEHICLE").

12.      A map of Northeast Munitions and the surrounding streets is included here for reference:



13.    On the evening of November 27, 2024, at approximately 10:05 p.m., the SUSPECT VEHICLE appears to pass by Northeast Munitions on Daniel Webster Highway travelling northbound before making a right-hand turn onto Railroad Avenue.  Video surveillance shows the SUSPECT VEHICLE sitting for approximately three minutes prior to departing south on Daniel Webster Highway.  At approximately 10:11 p.m., the SUSPECT VEHICLE is observed on video exiting Railroad Avenue with its four-way flashers engaged, before it ultimately parks on East Chamberlain Road, the next road south of the entrance to the plaza that Northeast Munitions and the DW Diner were located.   The SUSPECT VEHICLE then turns off all lights and sits on East Chamberlain Road for several minutes until another vehicle makes a right to travel up the road, at which time the SUSPECT VEHICLE once again engages its four-way flashers.

14.     After several minutes, the SUSPECT VEHICLE travels up East Chamberlain Road out of camera view of the DW Diner.  The SUSPECTS are observed on DW Diner video entering camera coverage from the direction that the SUSPECT VEHICLE was last observed, where investigators surmise that the vehicle may have been parked.  The SUSPECTS make their way around the back side of the plaza, passing surveillance cameras for The Children's Den, a daycare on the backside of the plaza.

15.     At 10:26 p.m., the SUSPECTS are then observed on Northeast Munitions surveillance breaking the bottom portion of the glass to the front door.  It takes the SUSPECTS approximately forty seconds to break the glass before entering.  The three SUSPECTS are individually described as follows:

    a.  The first suspect appeared to be thinly built and average height, wearing a mask, blue latex gloves, a hooded black sweatshirt with yellow writing on the chest, black sweatpants and white slide on sandals for footwear ("FIRST SUSPECT");

    b.  The second suspect appeared to be thinly built and average height, wearing a white mask, blue latex gloves, a gray hooded sweatshirt, gray sweatpants and black sneakers ("SECOND SUSPECT"); and

    c.  The third suspect appeared to be of heavier build and average height, wearing a mask, blue latex gloves, a black hooded sweatshirt, black sweatpants and white sneakers ("THIRD SUSPECT").

16.     Upon entering, the FIRST SUSPECT is heard on surveillance video yelling for the SECOND SUSPECT to give him the hammer.  The SECOND SUSPECT hands what appears to be a standard framing hammer with a light-colored wooden handle to the FIRST SUSPECT. The FIRST SUSPECT then smashes a display case.  All three SUSPECTS are seen taking

firearms from the shattered case.  The SECOND SUSPECT steals a shotgun from a floor rack located in the center of the store, while the THIRD SUSPECT steals an undetermined amount of ammunition.   The SUSPECTS then depart the store through the broken lower portion of the door from which they entered.  The SUSPECTS spend less than thirty seconds inside the store before exiting at approximately 10:27 p.m., according to Northeast Munitions surveillance footage.

17.     Surveillance footage from the DW Diner shows the FIRST SUSPECT sprinting along the side of the diner that runs parallel to Daniel Webster Highway, heading back in the direction of the general area that the SUBJECT VEHICLE was last observed on video surveillance.  The FIRST SUSPECT is followed by the SECOND SUSPECT and the THIRD SUSPECT.  The SECOND SUSPECT appears to drop a white object.[1]  The THIRD SUSPECT appears to drop a dark colored object near the door of DW Diner.[2]

18.     The FIRST SUSPECT is observed on DW Diner video running towards the back of the building adjacent to East Chamberlain, but does not appear on the Children's Den video in the rear of the building, leading investigators to surmise that the FIRST SUSPECT went along the back of the diner before jumping up on a retaining wall to return to the vehicle believed to be parked in the area of East Chamberlain Road.  The SECOND SUSPECT and THIRD SUSPECT are observed on video taking a path of travel, similar to the path used to walk in before the burglary, that runs parallel to Daniel Webster Highway by the D.W. Diner video surveillance, towards the area where the SUSPECT VEHICLE had last been observed on video surveillance. Just prior to reaching East Chamberlain Road, an SUV is observed traveling by the area of the

---

1 Law enforcement subsequently recovered and collected a white vape box in the same general area in which the white object was dropped.
2 Law enforcement subsequently recovered and collected a black grip backstrap for one of the stolen pistols in the area in which the dark colored object was dropped.

SECOND SUSPECT and THIRD SUSPECT on Daniel Webster Highway, causing the SECOND SUSPECT and THIRD SUSPECT to duck down in the scrub brush between the diner parking lot and East Chamberlain Road to avoid observation.

19.     Once the SUV passes by and heads up the hill on East Chamberlain, the beam of the headlights from the SUSPECT VEHICLE is visible, and the SECOND SUSPECT and THIRD SUSPECT can be observed exiting off the camera screen in the direction that the SUSPECT VEHICLE was last observed on video surveillance.  The SUSPECT VEHICLE then is observed on video traveling back up the hill on East Chamberlain Road, in the direction of Oak Street.  Another map of the area is included below for reference:



20.    At approximately 10:30 p.m., surveillance video from New Hampshire Hydraulics on Columbia Circle show the suspect vehicle head down Columbia Circle at a high rate of speed before ultimately turning right on Daniel Webster Highway and heading south.

21.    Approximately 1.3 miles south of New Hampshire Hydraulics on Daniel Webster Highway is a Gulf gas station at the intersection of Greeley Street, Continental Boulevard and Camp Sargent Road.  At approximately 10:33 p.m., video from the Gulf gas station shows a vehicle that appears to be similar to the SUSPECT VEHICLE make a right-hand turn onto the onramp for the Everett Turnpike South.

22.    At the time the burglary occurred, Northeast Munitions was closed and no store employees or their smartphones were present.

### BACKGROUND REGARDING CELL TOWERS

23.    Given that the SUSPECT VEHICLE was traveling in the 30 mile radius of Northeast Munitions, traveling between the area of Daniel Webster Highway between Railroad Ave and East Chamberlain Road in Merrimack, New Hampshire from 10:05 p.m. through the commencement of the robbery at approximately 10:26 p.m., and that the SUSPECTS were present inside of the store on video for less than thirty seconds at Northeast Munitions at approximately 10:27 p.m. before departing in the area of East Chamberlain Road, heading southerly by New Hampshire Hydraulics at 10:30 p.m., there is probable cause to believe that in the limited timeframe of 10:05 p.m. through 10:30 p.m. Eastern Standard Time ("EST") the suspects were in the 500 foot vicinity of the street address of Northeast Munitions (416 Daniel Webster Highway, Merrimack, New Hampshire 03056), located at the latitude and longitude of 42.8584444027695, -71.49184518372658 ("Location 1").  Additionally, all of the other businesses at the same street address were closed at the time of the burglary, limiting the amount

of innocent bystander data that may be disclosed as part of this request, making this request narrowly tailored to reflect any suspects that may be in the particular area of the crime as committed.  Based on my training and experience, I know that the WIRELESS PROVIDERS maintain cellular towers that provide service to Location 1.

24.    Based on my training and experience investigating FFL burglaries with multiple suspects, cell phones are often used to plan and coordinate the FFL burglary.  Given the facts of this case, where the burglary involved three SUSPECTS, took place at a time when the business and other businesses in the area were closed, and the SUSPECTS appeared to scout out the area for about 20-30 minutes before, it is likely that the SUSPECTS put some level of planning and coordination into executing this burglary which included cell phones to either communicate with each other and/or research Northeast Munitions and its' firearms (including their assessed/appraised values) as well as researching nearby businesses, including opening and closing time(s).  Additionally, further planning by the SUSPECTS is demonstrated by the fact that the SUSPECTS all wore masks, that the FIRST SUSPECT gave orders to co-conspirators during commission of the crime, that the robbery occurred very quickly (under 30 seconds), and specific guns within the store were targeted for theft while others were left undisturbed.  All of these facts lend to a level of planning which very likely involved the use of cellular devices.  In my training and experience, cell phones were likely used in this case to facilitate the research, planning, and communication regarding this particular coordinated FFL burglary at Location 1, and it is likely that at least one of the three SUSPECTS carried and/or used their phone in the planning and/or commission of this offense.

25.    I am also requesting the details of communications transmitted while devices were connected to the relevant tower(s).  The reason for this is that, in the event the SUSPECTS

11

contacted each other by call or text and were in the same area in order to share information or communicate, those calls or texts to the same cell phone numbers in the same location where they were already together would help identify the potential phone numbers of the SUSPECTS. Additionally, in the event law enforcement later identifies one or more of the SUSPECTS, who they contacted would be relevant to whether there were other co-conspirators besides the three SUSPECTS observed on the video; for example, based on my training and experience, other co-conspirators could include a get-away driver, another person on scene that assisted in the role of a scout or lookout, or a person at another location who was otherwise involved in the planning and execution of the TARGET OFFENSES.

26.    In my training and experience, I have learned that the WIRELESS PROVIDERS are companies that provide cellular communications service to the general public. In order to provide this service, many cellular service providers maintain antenna towers ("cell towers") that serve and provide cellular service to devices that are within range of the tower's signals. Each cell tower receives signals from wireless devices, such as cellular phones, in its general vicinity. By communicating with a cell tower, a wireless device can transmit and receive communications, such as phone calls, text messages, and other data. When sending or receiving communications, a cellular device does not always utilize the cell tower that is closest to it.

27.    Based on my training and experience, I also know that each cellular device is identified by one or more unique identifiers. For example, with respect to a cellular phone, the phone will be assigned both a unique telephone number but also one or more other identifiers such as an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile

Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI").  The types of identifiers assigned to a given cellular device are dependent on the device and the cellular network on which it operates.

28.    Based on my training and experience, I know that cellular providers such as the WIRELESS PROVIDERS in this case, routinely and in their regular course of business maintain historical records that allow them to determine which wireless devices used cellular towers on the cellular provider's network to send or receive communications.  For each communication sent or received via the wireless provider's network, these records may include: (1) the telephone call number and unique identifiers of the wireless device that connected to the provider's cellular tower and sent or received the communication ("the locally served wireless device"); (2) the cellular tower(s) on the provider's network, as well as the "sector" (*i.e.*, face of the tower),  to which the locally served wireless device connected when sending or receiving the communication; and (3) the date, time, and duration of the communication.  These records may also include the source and destination telephone numbers associated with the communication (including the number of the telephone that was called or that called the locally served wireless device) and the type of communication (e.g., phone call or SMS text message) that was transmitted.  On November 29, 2024, the United States sent preservation letters pursuant to 18 U.S.C. § 2703(f) to the WIRELESS PROVIDERS, that requested the providers preserve the data identified in Attachments A-1, A-2, A-3, A-4, A-5, and A-6.

29.    Thus, comparing the data from the cell towers identified in Attachments A-1, A-3, A-5, and A-6 that provide service to Location 1 will allow law enforcement to identify call numbers the SUSPECTS used during the commission of the burglary, since their devices are

likely one of a few devices located at Location 1 at the specific, narrowly tailored, 25-minute time frame requested.

30. Based on my training and experience, I know that cellular providers, such as the WIRELESS PROVIDERS in this case, have the ability to query their historical records to determine which cellular device(s) connected to a particular cellular tower during a given period of time and to produce the information described above. I also know that cellular providers have the ability to determine which cellular tower(s) provided coverage to a given location at a particular time.

31. Based on my training and experience, I am aware that information derived from cellular telephone towers can provide evidence of crimes and has assisted law enforcement officials in similar crimes. The same information has also been useful in the prosecution of those responsible for the crimes. Such records may be generated even when the user of a cellular telephone is not actively using the device, such as when receiving a phone call or text message. Additionally, depending on device settings and installed applications, cell phones may use a nearby cell tower to upload or download data at unpredictable times. Because the owner of a cell phone cannot necessarily control the timing of such communications, the longer a person remains in the coverage area of a given cell tower, the more likely it is that such records will be generated even if the owner is not actively using the phone.

32. Based on my training and experience and the above facts, I know that information obtained from cellular service providers such as WIRELESS PROVIDERS that reveals which devices used a particular cell tower (and, where applicable, sector) to engage in particular communications can be used to show that such devices were in the general vicinity of the cell tower at the time the communication occurred. Thus, there is probable cause to believe that the

14

records described in Attachments B-1, B-3, B-5 and B-6 will identify which wireless devices were connected to, and thus were in the general vicinity of, the cell towers that provided cellular service to Location 1 as identified in Attachments A-1, A-3, A-5, and A-6. This information, in turn, will assist law enforcement in determining which cellular devices were utilized by the SUSPECTS in the commission of the TARGET OFFENSES.

33.     Therefore, there is probable cause to believe that the SUSPECTS possessed a cell phone(s), near in time and place to the crimes described above, and that the records outlined in Attachments A-1, A-3, A-5, and A-6 will provide valuable information leading to the identification of those responsible and provide other useful leads which could further the overall investigation.

34.     The government will protect tower dump information related to innocent third parties by requesting only a limited geographical area around the time of the crime and for a specific, narrowly-tailored, 25-minute time frame, focusing first on any numbers that appear to contact each other and are both in the vicinity of the time and location requested in Attachments A-1, A-3, A-5, and A-6. In this case, where we know that there were at least three SUSPECTS involved in the commission of the TARGET OFFENSES, focusing on these individuals first may eliminate the need to further inquire of innocent cell phone users in the area.

35.     By obtaining and preserving the information requested herein and described in Attachments A-1, A-3, A-5, and A-6, investigators seek to identify possible cell phone(s) belonging to the SUSPECTS during their commission of the TARGET OFFENSES.

## BACKGROUND REGARDING AREA SEARCH DATA[3]

36.     Based on my training and experience and discussion with other agents, I have learned that WIRELESS PROVIDERS[4] offer a dataset that can calculate the estimated latitude and longitude coordinate position of a mobile device by determining the distance between the device and one or more locations (*i.e.,* cell towers) on the network.

37.     The WIRELESS PROVIDERS maintain data regarding cell phone connectivity with their cellular towers through estimated distance measurements, known as an area search. ("AREA SEARCH")  This data extends beyond users communicating through traditional text or phone calls and includes cell phone IMEI numbers for devices using third-party applications, browsing the internet, or otherwise utilizing resources from the cellular network. This data allows law enforcement to identify cell phone device identifiers that were in a specific area during the identified timeframe. Here, this data would be useful to this investigation because it would identify the SUSPECTS' cell phone identifiers if they communicated through a channel other than a traditional phone call or text message, such as a third-party application.  Thus, comparing the AREA SEARCH data identified in Attachments A-2 and A-4, that provide service to the Location 1 will allow law enforcement to identify the SUSPECTS' cell phone identifiers for any phone used during the burglary, since the SUSPECTS' device(s) is likely the only or one of few unique devices located in Location 1, at the specific, narrowly tailored, 25-minute time frame requested.

38.     Based on my training and experience, I know that the WIRELESS PROVIDERS collect timing advance measurements which estimate the approximate distance of the cellular

---

3 The proposed AREA SEARCH data warrant would only return information if the SUSPECTS possessed a phone serviced by the WIRELESS PROVIDERS.
4 The AREA SEARCH data warrants apply only to AT&T and T-Mobile, as RTT data is provided in Verizon's traditional tower dump return and U.S. Cellular does not retain RTT data.

device from a cellular tower based on the speed with which signals travel between the device and the tower.  This information can be used to estimate an approximate location range that is more precise than typical cell-site data.  Verizon refers to this data as "real-time tool" or ("RTT").  Timing advance measurements are also included in AT&T's estimated location dataset known as LocDBoR (Location Database of Record).  T-Mobile refers to timing advance by name.  I also know that Verizon keeps this data for approximately 7 days, T-Mobile keeps it for approximately 30 days, and AT&T keeps it for approximately 13 months as of May 2023.[5]  U.S. Cellular does not retain RTT data.

39.     When available, Verizon provides RTT information in conjunction with a Tower Dump warrant. T-Mobile and AT&T require language separate from a Tower Dump to search Timing Advance data, herein collectively referred to as "AREA SEARCH data."

40.     Based on my training and experience, and the facts set forth above, there is a high likelihood that the SUSPECTS possess cell phone(s) and that the cell phone(s) connected to a cellular tower that provides service to the area in the vicinity of the burglary.  Because the WIRELESS PROVIDERS are the top four providers nationwide, and because they maintain searchable AREA SEARCH data, there is a fair probability that the requested data will show the SUSPECTS cell phones in the vicinity of Location 1.

41.     As explained above, there is probable cause to believe the SUSPECTS possessed a cell phone(s), near in time and place to the crimes described above, and that the records outlined in Attachments A-2, A-4, and A-5 will provide valuable information leading to the identification of said cell phone(s), which would further the overall investigation into the burglary.

---

5 On or around November 29, 2024, investigators served the WIRELESS PROVIDERS with a preservation letters for relevant data.  Investigators therefore believe, despite retention periods, the WIRELESS PROVIDERS are in possession of the aforementioned data.

42.    The government will protect AREA SEARCH information related to innocent third parties by requesting only a limited geographical area around the time of the crime and for a specific, narrowly-tailored, 25-minute time frame, focusing first on any numbers that appear to contact each other and are both in the vicinity of the time and location requested in Attachments A-2, A-4, and A-5.  In this case, where we know that there were at least three SUSPECTS involved in the commission of the TARGET OFFENSES, focusing on these individuals first may eliminate the need to further inquire of innocent cell phone users in the area.

43.    By obtaining and preserving the information requested herein and described in Attachments A-2, A-4, and A-5, investigators seek to identify possible cell phone(s) belonging to the SUSPECTS during their commission of the TARGET OFFENSES.

## AUTHORIZATION REQUEST

44.    Based on the foregoing, I request that the Court issue the proposed search warrants, pursuant to 18 U.S.C. § 2703(c) in the property to be searched as described in Attachments A-1, A-2, A-3, A-4, A-5 and A-6.

45.    I further request that the Court direct the WIRELESS PROVIDERS to disclose to the government any information described in Section I of Attachments B-1, B-3, B-5, and B-6 that is within its possession, custody, or control.  Because the warrants will be served on the WIRELESS PROVIDERS, which will then compile the requested records at a time convenient to them, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

46.    I further request that the Court direct the WIRELESS PROVIDERS to disclose to the government any information described in Section I of Attachments B-2, B-4, and B-5 that is within its possession, custody, or control.  Because the warrant will be served on the WIRELESS

18

PROVIDERS, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

### CONCLUSION

47.　Based on the information described above, I submit there is probable cause to believe that the places to be searched as described in Attachments A-1, A-2, A-3, A-4, A-5, and A-6 for the information requested in Attachments B-1, B-2, B-3, B-4, B-5, and B-6 constitute evidence of violations of the TARGET OFFENSES committed by the SUSPECTS.

Respectfully submitted,

/s/ Timothy S. Hoover
Timothy S. Hoover
Special Agent
Bureau of Alcohol, Tobacco, Firearms &
Explosives

Subscribed and sworn to via telephone in accordance with Fed. R. Crim. P. 4.1 on January 8, 2025.

HON. ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

19

## ATTACHMENT A-1

### Property to Be Searched

Records and information associated with communications to and from the following cellular antenna towers ("cell towers") on the identified date(s) and timeframe(s) that are within the possession, custody, or control of the cellular service provider(s) identified below:

| Cell Towers | Dates | Times (EST) |
|---|---|---|
| The cellular towers that provided cellular service to: | November 27, 2024 | 10:05 p.m. to 10:30 p.m. EST |

Street Address:  416 Daniel Webster Highway, Merrimack, New Hampshire 03056

Latitude / Longitude: 42.8584444027695, -71.49184518372658

The following cellular service provider(s) are required to disclose information to the United States pursuant to this warrant:

- AT&T Corporation, a cellular service provider headquartered at 11760 U.S. Highway 1, Suite 300, North Palm Beach, Florida 33408.

1

**ATTACHMENT A-2**

**Property to Be Searched**

Records and information associated with AREA SEARCH data for all records of mobile devices which are determined to be present within the specified geographic location boundaries based upon the AREA SEARCH data estimated geocoordinates for each respective mobile device that falls within the authorized date and time range provided below:

- All devices estimated to be within a .30 mile radius of Location 1 (Street Address:  416 Daniel Webster Highway, Merrimack, New Hampshire 03056), further identified by geocoordinates Latitude / Longitude:  42.8584444027695, -71.49184518372658, from November 27, 2024 from 10:05 p.m. EST to 10:30 p.m. EST.

The following cellular service provider is required to disclose information to the United States pursuant to this warrant:

- AT&T Corporation, a cellular service provider headquartered at 11760 U.S. Highway 1, Suite 300, North Palm Beach, Florida 33408.

**ATTACHMENT A-3**

**Property to Be Searched**

Records and information associated with communications to and from the following

cellular antenna towers ("cell towers") on the identified date(s) and timeframe(s) that are within

the possession, custody, or control of the cellular service provider(s) identified below:

| Cell Towers | Dates | Times (EST) |
|---|---|---|
| The cellular towers that provided cellular service to: | November 27, 2024 | 10:05 p.m. to 10:30 p.m. EST |

Street Address:  416 Daniel
Webster Highway, Merrimack,
New Hampshire 03056

Latitude / Longitude:
42.8584444027695, -
71.49184518372658

The following cellular service provider(s) are required to disclose information to the

United States pursuant to this warrant:

- T-Mobile US, Inc. ("T-Mobile"), a cellular service provider headquartered at 4 Sylvan

  Way, Parsippany, New Jersey.

**ATTACHMENT A-4**

**Property to Be Searched**

Records and information associated with AREA SEARCH data for all records of mobile devices which are determined to be present within the specified geographic location boundaries based upon the AREA SEARCH data estimated geocoordinates for each respective mobile device that falls within the authorized date and time range provided below:

- All devices estimated to be within a .30 mile radius of Location 1 (Street Address: 416 Daniel Webster Highway, Merrimack, New Hampshire 03056), further identified by geocoordinates Latitude / Longitude: 42.8584444027695, -71.49184518372658, from November 27, 2024 from 10:05 p.m. EST to 10:30 p.m. EST.

The following cellular service provider is required to disclose information to the United States pursuant to this warrant:

- T-Mobile US, Inc. ("T-Mobile"), a cellular service provider headquartered at 4 Sylvan Way, Parsippany, New Jersey.

4

## ATTACHMENT A-5

### Property to Be Searched

Records and information associated with communications to and from the following cellular antenna towers ("cell towers") on the identified date(s) and timeframe(s) that are within the possession, custody, or control of the cellular service provider(s) identified below:

| Cell Towers | Dates | Times (EST) |
|---|---|---|
| The cellular towers that provided cellular service to: | November 27, 2024 | 10:05 p.m. to 10:30 p.m. EST |

Street Address: 416 Daniel Webster Highway, Merrimack, New Hampshire 03056

Latitude / Longitude: 42.8584444027695, -71.49184518372658

The following cellular service provider(s) are required to disclose information to the United States pursuant to this warrant:

- Cellco Partnership d/b/a Verizon Wireless ("Verizon"), a cellular service provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey.

5

**ATTACHMENT A-6**

**Property to Be Searched**

Records and information associated with communications to and from the following

cellular antenna towers ("cell towers") on the identified date(s) and timeframe(s) that are within

the possession, custody, or control of the cellular service provider(s) identified below:

| Cell Towers | Dates | Times (EST) |
|---|---|---|
| The cellular towers that provided cellular service to: | November 27, 2024 | 10:05 p.m. to 10:30 p.m. EST |

Street Address: 416 Daniel
Webster Highway, Merrimack,
New Hampshire 03056

Latitude / Longitude:
42.8584444027695, -
71.49184518372658

The following cellular service provider(s) are required to disclose information to the

United States pursuant to this warrant:

- United States Cellular Corporation ("U.S. Cellular"), a cellular service provider

  headquartered at 8410 W Bryn Mawr Ave, Suite 700, Chicago, Illinois.

6

**ATTACHMENT B-1**

**Particular Things to be Seized**

**I.  Information to be Disclosed by the Provider**

For each cell tower in described in Attachment A-1, the cellular service provider identified in Attachment A-1 is required to disclose to the United States records and other information about all communications made using the cellular tower(s) identified in Attachment A-1 during the corresponding timeframe(s) listed in Attachment A-1, including records that identify:

    a.  the telephone call number and unique identifiers for each wireless device in the vicinity of the cell tower ("the locally served wireless device") that registered with the cell tower, including through voice, SMS, MMS, and data activity, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), and International Mobile Equipment Identities ("IMEI");

    b.  the source and destination telephone numbers associated with each communication (including the number of the locally served wireless device and the number of the telephone that transmitted a communication to, or to which a communication was transmitted by, the locally served wireless device);

    c.  the date, time, and duration of each communication;

d.  all data about which "cell towers" (i.e., antenna towers covering specific

geographic areas) and "sectors" (i.e. the faces of the towers) received a radio

signal from each cellular telephone or device assigned to the tower (to include

all voice, SMS/MMS, and data sessions).

e.  the type of communication transmitted through the tower (such as phone call,

text message, or data event).

These records should include records about communications that were initiated before or

terminated after the timeframe(s) identified in Attachment A-1 if some part of the

communication occurred during the relevant timeframe(s) listed in Attachment A-1.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18

U.S.C. §922(j), unlawful possession of a stolen firearm, and 18 U.S.C. §922(u) theft from a

Federal Firearms Licensee ("FFL"), and 18 U.S.C. § 371: conspiracy to commit the offenses of

18 U.S.C. §922(j) and 18 U.S.C. §922(u) (collectively, the "TARGET OFFENSES"), during the

period of November 27, 2024, as previously identified in Attachment A-1.

The government will protect tower dump information related to innocent third parties by

requesting only a limited geographical area around the time of the crime and for a specific,

narrowly-tailored, 25-minute time frame, focusing first on any numbers that appear to contact

each other and are both in the vicinity of the time and location requested in Attachment A-1.  In

this case, where we know that there were at least three SUSPECTS involved in the commission

of the TARGET OFFENSES, focusing on these individuals first may eliminate the need to

further inquire of innocent cell phone users in the area.

8

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the cellular service provider identified in Attachment A-1 in order to locate the things particularly described in this Warrant.

**ATTACHMENT B-2**

**Particular Things to be Seized**

**I.      Information to be Disclosed by the Provider**

For each cell tower in described in Attachment A-2, the cellular service provider identified in Attachment A-2 is required to disclose to the United States records and other information (not including the contents of communications) about all communications made using the cell towers identified in Attachment A-2 during the corresponding timeframes listed in Attachment A-2, including records that identify:

a. the telephone call number and unique identifiers for each wireless device in the vicinity of the cell tower ("the locally served wireless device") that registered with the cell tower, including through voice, SMS, MMS, and data activity, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), and International Mobile Equipment Identities ("IMEI");

b. the source and destination telephone numbers associated with each communication (including the number of the locally served wireless device and the number of the telephone that transmitted a communication to, or to which a communication was transmitted by, the locally served wireless device);

c. the date, time, and duration of each communication;

d. all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e. the faces of the towers) received a radio signal from

10

each cellular telephone or device assigned to the tower (to include all voice, SMS/MMS, and data sessions).

e. the type of communication transmitted through the tower (such as phone call, text message, or data event); and

f. specialized location records within .30 of a mile of the address provided in Attachment A-2 related to all calls, SMS/MMS, and/or data connections made (and on the pertinent date and during the pertinent time period) for each set of coordinates listed in Attachment A-2. Such records are referred to as LOCDBOR, RTT, Timing Advance, and/or PCMD by different cellular carriers, and such data may show cell sites, sectors, distance measurements, and/or estimated handset locations.

These records should include records about communications that were initiated before or terminated after the timeframes identified in Attachment A-2 if some part of the communication occurred during the relevant timeframes listed in Attachment A-2.

## II.   Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §922(j), unlawful possession of a stolen firearm, and 18 U.S.C. §922(u) theft from a Federal Firearms Licensee ("FFL"), and 18 U.S.C. § 371: conspiracy to commit the offenses of 18 U.S.C. §922(j) and 18 U.S.C. §922(u) (collectively, the "TARGET OFFENSES"), during the period of November 27, 2024, as previously identified in Attachment A-2.

The government will protect tower dump information related to innocent third parties by requesting only a limited geographical area around the time of the crime and for a specific, narrowly-tailored, 25-minute time frame, focusing first on any numbers that

11

appear to contact each other and are both in the vicinity of the time and location requested in Attachment A-2.  In this case, where we know that there were at least three SUSPECTS involved in the commission of the TARGET OFFENSES, focusing on these individuals first may eliminate the need to further inquire of innocent cell phone users in the area.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the cellular service provider identified in Attachment A-2 in order to locate the things particularly described in this Warrant.

## ATTACHMENT B-3

### Particular Things to be Seized

### I. Information to be Disclosed by the Provider

For each cell tower in described in Attachment A-3, the cellular service provider identified in Attachment A-3 is required to disclose to the United States records and other information about all communications made using the cellular tower(s) identified in Attachment A-3 during the corresponding timeframe(s) listed in Attachment A-3, including records that identify:

    a.  the telephone call number and unique identifiers for each wireless device in the vicinity of the cell tower ("the locally served wireless device") that registered with the cell tower, including through voice, SMS, MMS, and data activity, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), and International Mobile Equipment Identities ("IMEI");

    b.  the source and destination telephone numbers associated with each communication (including the number of the locally served wireless device and the number of the telephone that transmitted a communication to, or to which a communication was transmitted by, the locally served wireless device);

    c.  the date, time, and duration of each communication;

13

d.  all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e. the faces of the towers) received a radio signal from each cellular telephone or device assigned to the tower (to include all voice, SMS/MMS, and data sessions).

e.  the type of communication transmitted through the tower (such as phone call, text message, or data event).

These records should include records about communications that were initiated before or terminated after the timeframe(s) identified in Attachment A-3 if some part of the communication occurred during the relevant timeframe(s) listed in Attachment A-3.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §922(j), unlawful possession of a stolen firearm, and 18 U.S.C. §922(u) theft from a Federal Firearms Licensee ("FFL"), and 18 U.S.C. § 371: conspiracy to commit the offenses of 18 U.S.C. §922(j) and 18 U.S.C. §922(u) (collectively, the "TARGET OFFENSES"), during the period of November 27, 2024, as previously identified in Attachment A-3.

The government will protect tower dump information related to innocent third parties by requesting only a limited geographical area around the time of the crime and for a specific, narrowly-tailored, 25-minute time frame, focusing first on any numbers that appear to contact each other and are both in the vicinity of the time and location requested in Attachment A-3.  In this case, where we know that there were at least three SUSPECTS involved in the commission of the TARGET OFFENSES, focusing on these individuals first may eliminate the need to further inquire of innocent cell phone users in the area.

14

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the cellular service provider identified in Attachment A-3 in order to locate the things particularly described in this Warrant.

## ATTACHMENT B-4

### Particular Things to be Seized

**I.      Information to be Disclosed by the Provider**

For each cell tower in described in Attachment A-4, the cellular service provider identified in Attachment A-4 is required to disclose to the United States records and other information (not including the contents of communications) about all communications made using the cell towers identified in Attachment A-4 during the corresponding timeframes listed in Attachment A-4, including records that identify:

a. the telephone call number and unique identifiers for each wireless device in the vicinity of the cell tower ("the locally served wireless device") that registered with the cell tower, including through voice, SMS, MMS, and data activity, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), and International Mobile Equipment Identities ("IMEI");

b. the source and destination telephone numbers associated with each communication (including the number of the locally served wireless device and the number of the telephone that transmitted a communication to, or to which a communication was transmitted by, the locally served wireless device);

c. the date, time, and duration of each communication;

d. all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e. the faces of the towers) received a radio signal from

16

each cellular telephone or device assigned to the tower (to include all voice, SMS/MMS, and data sessions).

e. the type of communication transmitted through the tower (such as phone call, text message, or data event); and

f. specialized location records within .30 of a mile of the address provided in Attachment A-4 related to all calls, SMS/MMS, and/or data connections made (and on the pertinent date and during the pertinent time period) for each set of coordinates listed in Attachment A-4. Such records are referred to as LOCDBOR, RTT, Timing Advance, and/or PCMD by different cellular carriers, and such data may show cell sites, sectors, distance measurements, and/or estimated handset locations.

These records should include records about communications that were initiated before or terminated after the timeframes identified in Attachment A-4 if some part of the communication occurred during the relevant timeframes listed in Attachment A-4.

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §922(j), unlawful possession of a stolen firearm, and 18 U.S.C. §922(u) theft from a Federal Firearms Licensee ("FFL"), and 18 U.S.C. § 371: conspiracy to commit the offenses of 18 U.S.C. §922(j) and 18 U.S.C. §922(u) (collectively, the "TARGET OFFENSES"), during the period of November 27, 2024, as previously identified in Attachment A-4.

The government will protect tower dump information related to innocent third parties by requesting only a limited geographical area around the time of the crime and for a specific, narrowly-tailored, 25-minute time frame, focusing first on any numbers that

appear to contact each other and are both in the vicinity of the time and location requested in Attachment A-4. In this case, where we know that there were at least three SUSPECTS involved in the commission of the TARGET OFFENSES, focusing on these individuals first may eliminate the need to further inquire of innocent cell phone users in the area.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the cellular service provider identified in Attachment A-4 in order to locate the things particularly described in this Warrant.

**ATTACHMENT B-5**

**Particular Things to be Seized**

### I. Information to be Disclosed by the Provider

For each cell tower in described in Attachment A-5, the cellular service provider identified in Attachment A-5 is required to disclose to the United States records and other information about all communications made using the cellular tower(s) identified in Attachment A-5 during the corresponding timeframe(s) listed in Attachment A-5, including records that identify:

    a.  the telephone call number and unique identifiers for each wireless device in the vicinity of the cell tower ("the locally served wireless device") that registered with the cell tower, including through voice, SMS, MMS, and data activity, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), and International Mobile Equipment Identities ("IMEI");

    b.  the source and destination telephone numbers associated with each communication (including the number of the locally served wireless device and the number of the telephone that transmitted a communication to, or to which a communication was transmitted by, the locally served wireless device);

    c.  the date, time, and duration of each communication;

19

d.  all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e. the faces of the towers) received a radio signal from each cellular telephone or device assigned to the tower (to include all voice, SMS/MMS, and data sessions).

e.  the type of communication transmitted through the tower (such as phone call, text message, or data event); and

f.  specialized location records provided in A-5 related to all calls, SMS/MMS, and/or data connections made (and on the pertinent date and during the pertinent time period) for each set of coordinates listed in Attachment A-5. Such records are referred to as LOCBDOR, RTT, Timing Advance, and/or PCMD by different cellular carriers, and such data may show cell sites, sectors, distance measurements, and/or estimated handset locations.

These records should include records about communications that were initiated before or terminated after the timeframe(s) identified in Attachment A-5 if some part of the communication occurred during the relevant timeframe(s) listed in Attachment A-5.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §922(j), unlawful possession of a stolen firearm, and 18 U.S.C. §922(u) theft from a Federal Firearms Licensee ("FFL"), and 18 U.S.C. § 371: conspiracy to commit the offenses of 18 U.S.C. §922(j) and 18 U.S.C. §922(u) (collectively, the "TARGET OFFENSES"), during the period of November 27, 2024, as previously identified in Attachment A-5.

The government will protect tower dump information related to innocent third parties by requesting only a limited geographical area around the time of the crime and for a specific,

narrowly-tailored, 25-minute time frame, focusing first on any numbers that appear to contact each other and are both in the vicinity of the time and location requested in Attachment A-5.  In this case, where we know that there were at least three SUSPECTS involved in the commission of the TARGET OFFENSES, focusing on these individuals first may eliminate the need to further inquire of innocent cell phone users in the area.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the cellular service provider identified in Attachment A-5 in order to locate the things particularly described in this Warrant.

21

**ATTACHMENT B-6**

**Particular Things to be Seized**

## I. Information to be Disclosed by the Provider

For each cell tower in described in Attachment A-6, the cellular service provider identified in Attachment A-6 is required to disclose to the United States records and other information about all communications made using the cellular tower(s) identified in Attachment A-6 during the corresponding timeframe(s) listed in Attachment A-6, including records that identify:

    a.  the telephone call number and unique identifiers for each wireless device in the vicinity of the cell tower ("the locally served wireless device") that registered with the cell tower, including through voice, SMS, MMS, and data activity, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), and International Mobile Equipment Identities ("IMEI");

    b.  the source and destination telephone numbers associated with each communication (including the number of the locally served wireless device and the number of the telephone that transmitted a communication to, or to which a communication was transmitted by, the locally served wireless device);

    c.  the date, time, and duration of each communication;

22

d.  all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e. the faces of the towers) received a radio signal from each cellular telephone or device assigned to the tower (to include all voice, SMS/MMS, and data sessions).

e.  the type of communication transmitted through the tower (such as phone call, text message, or data event); and

f.  specialized location records provided in A-6 related to all calls, SMS/MMS, and/or data connections made (and on the pertinent date and during the pertinent time period) for each set of coordinates listed in Attachment A-6. Such records are referred to as LOCBDOR, RTT, Timing Advance, and/or PCMD by different cellular carriers, and such data may show cell sites, sectors, distance measurements, and/or estimated handset locations.

These records should include records about communications that were initiated before or terminated after the timeframe(s) identified in Attachment A-6 if some part of the communication occurred during the relevant timeframe(s) listed in Attachment A-6.

## II.  Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §922(j), unlawful possession of a stolen firearm, and 18 U.S.C. §922(u) theft from a Federal Firearms Licensee ("FFL"), and 18 U.S.C. § 371: conspiracy to commit the offenses of 18 U.S.C. §922(j) and 18 U.S.C. §922(u) (collectively, the "TARGET OFFENSES"), during the period of November 27, 2024, as previously identified in Attachment A-6.

The government will protect tower dump information related to innocent third parties by requesting only a limited geographical area around the time of the crime and for a specific,

narrowly-tailored, 25-minute time frame, focusing first on any numbers that appear to contact each other and are both in the vicinity of the time and location requested in Attachment A-6. In this case, where we know that there were at least three SUSPECTS involved in the commission of the TARGET OFFENSES, focusing on these individuals first may eliminate the need to further inquire of innocent cell phone users in the area.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the cellular service provider identified in Attachment A-6 in order to locate the things particularly described in this Warrant.